UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

    - against -                                             22 Cr. 00019 (PGG)

BRADLEY PIERRE, et al.,

          Defendant.

--------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF
DEFENDANT ARTHUR BOGORAZ'S MOTION FOR RECONSIDERATION OF
THE COURT'S DENIAL TO ADJOURN THE TRIAL, AND UPON
RECONSIDERATION, GRANTING A REASONABLE ADJOURNMENT**

Dated: New York, New York
       December 24, 2023

                                    Aaron M. Rubin, Esq.

                                    99 Wall Street Suite 1130
                                    New York, New York 10005
                                    Tel.: (212) 725 - 4600
                                    arubin@amresquire.com
                                    *Counsel for ARTHUR BOGORAZ*

# <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**. ................................................................. ii

**PRELIMINARY STATEMENT** ..........................................................1

**ARGUMENT POINT I**:
MR. BOGORAZ WAS ONLY APPRISED
OF THE NEW MONEY LAUNDERING
CHARGE FOR THE FIRST TIME A
MONTH BEFORE TRIAL ....................................................................3

**ARGUMENT POINT II**:
THE GOVERNMENT'S FAILURE TO
PROVIDE THE COMPLETE RECORDS
FOR THE SUBJECT BANK ACCOUNTS
IS A MATERIAL OMISSION THAT
WILL PREVENT MR. BOGORAZ FROM
DEFENDING THE NEWLY ASSERTED
MONEY LAUNDERING ALLEGATION
AND FOR WHICH ADDITIONAL TIME
IS NEEDED...........................................................................................9

**ARGUMENT POINT III**:
AN ADJOURNMENT IS NEEDED TO
INVESTIGATE NEW MATTERS THAT
HAVE ONLY RECENTLY COME TO
THE ATTENTION OF THE DEFENSE,
WHICH MR. BOGORAZ IS ENTITLED
TO AND ARE NECESSARY FOR
IMPEACHMENT OF THE CENTRAL
COOPERATING WITNESS ...............................................................14

**CONCLUSION** .................................................................................18

## <u>TABLE OF AUTHORITIES</u>

Cases                                                              Page(s)

<u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963). ...................................................16

<u>United States</u> v. <u>Avellino</u>, 136 F.3d 249 (2d Cir. 1998). .......................................17

<u>United States</u> v. <u>Chen</u>, 378 F.3d 151 (2d Cir. 2004).................................6

<u>United States</u> v. <u>GAF Corp.</u>, 928 F.2d 1253 (2d Cir. 1991) ...................................6

<u>United States</u> v. <u>Giglio</u>, 405 U.S. 150 (1972). ........................................................16

<u>United States</u> v. <u>Paternina-Vergara</u>, 749 F.2d 993 (2d Cir. 1984). ..............................................................................................17

<u>Perkins</u> v. <u>LeFevre</u>, 642 F.2d 37 (2d Cir. 1981). ....................................16

<u>United States</u> v. <u>Meregildo</u>, 920 F. Supp. 2d 434 (S.D.N.Y. 2013). ...........................................................................................16

<u>United States</u> v. <u>Napoli</u>, 54 F.3d 63 (2d Cir. 1995) .................................4

<u>United States</u> v. <u>Rodriguez</u>, 496 F.3d 221 (2d Cir. 2007). ............................. 16-17

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted in support of Arthur Bogoraz's motion for reconsideration of the Court's denial of his request to adjourn the trial, and upon reconsideration, granting a reasonable adjournment.

The adjournment that Mr. Bogoraz respectfully seeks relates to his defense to the new charge of money laundering contained under Count 5 of the second superseding indictment (at *ECF* 282) that was filed on December 6, 2023.

The parties most recently appeared on December 12, 2023, during which time Mr. Bogoraz, through his counsel, requested an adjournment of the trial date that is presently scheduled for January 16, 2024. The reason for the request was to permit the defense a reasonable period of time to (1) conduct a proper investigation of the newly added money laundering charge, (2) to reexamine the voluminous discovery for defenses and address any deficiencies in production that would require additional time and materials to be sought and obtained, and from which to investigate leads and identity and interview potential defense witnesses, and (3) formulate defenses to the newly learned and significantly more severe charge.

At the December 12 conference, the Court denied Mr. Bogoraz's adjournment request. (See Exhibit A: Dec. 12 Transcript, at pages 10 – 14)[1] The Court's denial was premised on two assumptions, that (1) Mr. Bogoraz had been sufficiently apprised of the nature of the money laundering charges prior to the Government's filing of the second superseding indictment, and (2) the newly asserted Count 5 of money laundering would not require any additional discovery because it was

---

[1] All exhibits referenced herein are those that are annexed to the Declaration of Aaron M. Rubin dated December 24, 2023, that is submitted as part of this motion for reconsideration.

based on the same evidence and contained in the already existing production by the Government. These assumptions were derived from certain representations by the Government about the nature of the charges against Mr. Bogoraz and the scope of its discovery production.

After further review, however, it is apparent that the Government's representations in this regard were not accurate. Following a preliminary and expedited reexamination by the defense of various portions of the discovery and the applicable law and legal theories since the December 12 conference, there is clear basis for the Court to revisit the validity of the assumptions that formed the basis of its denial of Mr. Bogoraz's request, and, upon reconsideration, grant his requested trial adjournment.

Granting the requested adjournment will not cause material prejudice to the Government's case, as the Government was already prepared and willing to reschedule the trial to at least March of 2024, as indicated in its series of previously filed letters requesting such an adjournment. (See Exhibit B: Government letters for adjournment dated October 2 and 4, at *ECF* 235, 230 and 229)

On the other hand, the denial of Mr. Bogoraz's adjournment request will cause him irreversible prejudice because he and his retained counsel, by no fault of their own, are without necessary materials (which are most importantly the complete set of bank records for the entities alleged to be the vehicles of laundering) that were not yet provided by the Government in its discovery, and have not had a sufficient and reasonable amount of time to obtain these materials and prepare for trial on the newly asserted money laundering charge.

## ARGUMENT POINT I:

### MR. BOGORAZ WAS ONLY APPRISED OF THE NEW MONEY LAUNDERING CHARGE FOR THE FIRST TIME A MONTH BEFORE TRIAL

Two days after filing the second superseding indictment on December 6 containing the new money laundering count against Mr. Bogoraz, the Government claimed in a letter, attached as Exhibit C, that the newly asserted money laundering count a month before trial imposed "no prejudice" on the defense because "counsel has been aware of the potential charge and related facts for over a year." This claim by the Government mischaracterizes the record. While Mr. Bogoraz may have been generally aware of the potential of a superseding money laundering charge from an informal (and never in court) statement by the Government, the Government never provided any explanation of the nature of such charges (except to say "money laundering charge") until doing so for the first time at the conference on December 12. This point is critical to evaluating the prejudice to Mr. Bogoraz because it was only after hearing the Government's more particularized explanation of the charges at that recent conference that Mr. Bogoraz and counsel were able to determine the material deficiencies in the Government's discovery relating to the new money laundering count, and the detrimental impact those deficiencies would have on Mr. Bogoraz's ability to effectively defend the new charge.

Prior to the filing of the second superseding indictment on December 6, Mr. Bogoraz's awareness of the possible nature of a potential money laundering charge could only be reasonably derived from the allegations contained in the initial indictment (*ECF* 1) and the first superseding indictment (*ECF* 191).

With respect to the initial indictment, which contained money laundering allegations that had been the subject of the majority of pre-trial litigation in this case, Count 2 originally charged co-defendants Bradley Pierre, Marvin Moy and William Weiner with laundering proceeds of healthcare fraud.  (See Indictment, filed at *ECF* 1) To prove such a charge, the Government would therefore be required to provide evidence to show, among other things, a healthcare fraud conspiracy that generated illicit proceeds, and that Mr. Bogoraz had knowledge of the illicit nature of those proceeds (in other words, he knew of the healthcare fraud).[2]  The initial indictment's focus on healthcare fraud money laundering was also indirectly referenced in Count 1, which referenced Mr. Bogoraz in that substantive charge for healthcare fraud without charging him for it.  (See Indictment, at *ECF* 1, ¶ 9)

When the Government eventually filed its first superseding indictment on June 26, 2023, (which was not arraigned until two months lates), it contained a new money laundering charge alleging both healthcare and bribery proceeds, but notably left Mr. Bogoraz out of it.  At that time, Mr. Bogoraz and counsel reasonably concluded that he would not be included in any money laundering allegations.  Indeed, if there was any confusion on the subject of whether Mr. Bogoraz would be included in any additional charges, the Government specifically clarified the point upon the arraignment on the first superseding indictment on August 28, 2023, when the Court mistakenly assumed that an

---

[2] See, e.g., United States v. Napoli, 54 F.3d 63, 67 (2d Cir. 1995) (reciting that money laundering allegations "requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds").

additional charge had been filed against him.[3]  At the conclusion of the August 28

conference, the Court scheduled the trial for January 16, 2024, and the Government made

no mention, (nor gave any other indication), that any additional charges would be

forthcoming for Mr. Bogoraz

       Additionally, even though the money laundering charge in the first

superseding indictment (in Count 2) now referred to "bribery proceeds," the fact that this

count charged only Bradley Pierre, Marvin Moy and William Weiner only suggested that

such bribery proceeds related to a separate scheme of bribery in the context of healthcare

fraud, since this set of co-defendants presumably related to alleged bribes to provide

patients for medical offices, which was different from that which was eventually alleged

by the Government against Mr. Bogoraz in a separate count nearly six months later in the

second superseding indictment in December one month prior to the trial.

       In any event, the money laundering charges in both the initial indictment

and first superseding indictment were the most bare-bones statements permitted under the

law, doing nothing more than tracking the language of the statute.  If Mr. Bogoraz had

---

[3] See Transcript, August 28, 2023, Court conference, at *ECF* 222, at pages 5-6:

MR. ANDREWS: One clarification. For Count One it is just Bradley Pierre and William Weiner who are charged with the healthcare fraud. The indictment is a little bit confusing. I know the way it is written, but in terms of the statutory allegations later on, only those two defendants, as well as Marvin Moy are in Count One.

THE COURT: All right. I am confused then because I am looking at paragraph 1 and it in all caps lists all of the defendants, but you are telling me that actually not all are charged in Count One.

MR. ANDREWS: So that is more of an overview portion of the indictment, your Honor, in terms of the speaking indictment, and as I said before, I understand that it is a little bit confusing because of the way that the indictment is labeled in that way. However, when you get to, later on, to the actual statutory allegations, it is just Bradley Pierre and William Weiner and Marvin Moye who are named as being charged in Count One.

THE COURT: OK. Well, that's on page 13, so it takes a long time to get there. All right. So with respect to Count One I mistakenly said that Mr. Bogoraz and Mr. Jean Pierre are charged in Count One, that was in error, so please understand that only Mr. Bradley Pierre and Dr. Weiner are charged in Count One.

been actually charged in a money laundering count in either the initial indictment or first superseding indictment, instead of merely facing the hypothetical potential of an unspecified charge, he would have certainly requested (and been entitled to) a bill of particulars from the Government to determine the nature of the allegations, and more specifically, the vehicles for the alleged financial transactions at stake and the nature of the alleged illicit proceeds laundered, and the scope of the potential evidence and discovery in order to present a meaningful defense.  See, e.g., United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991) (noting that the purpose of a bill of particulars is to "inform a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy"); United States v. Chen, 378 F.3d 151, 162-63 (2d Cir. 2004) ("A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.")

However, without being so charged, Mr. Bogoraz had no reasonable cause to believe he should make such a request or pursue such specificity since it was not relevant to the defenses he anticipated to assert relating to the sole count of Travel Act bribery that he was facing, (and furthermore, it is safe to presume that such a request for particulars relating to a money laundering count that he was not charged with would have been denied as premature).  Mr. Bogoraz was therefore, during the majority of the case, prejudiced from not knowing the sufficiently particularized nature of the money laundering charge that he would eventually be charged with, until the conference on December 12.  Certainly, the Government could have voluntarily provided sufficient particulars at any previous time, but did not.

On December 12, less than a week after Mr. Bogoraz was actually charged with money laundering in the second superseding indictment and only in response to the Court's inquiry, did the Government provide the following statements:

MR. RUBIN:       . . . but, your Honor, I don't know what the charge is. All it does is just track the language of the indictment.

THE COURT:       Well, that's all an indictment has to do, sir.

MR. RUBIN:       Well, your Honor, I still have to prepare for a money laundering case. I have to go over the mammoth amount of documents to determine –

THE COURT:       All right. Let me hear from the government.

MR. ANDREWS:   Judge, we're happy to articulate on the record right now exactly what the money laundering charge is. As defense counsel is aware, their client was originally charged with conspiracy to commit bribery. Mr. Bogoraz, while working for his wife's law firm, paid Anthony Rose to distribute bribes to various individuals, and your Honor is familiar with the rest of it.

                  Now, once Mr. Bogoraz received victims at his law firm, he signed them up, and he proceeded to pay kickbacks, the proceeds of the bribery scheme. In order to hide the fact that those kickbacks were proceeds of bribery, he assisted Anthony Rose to open up two shell companies. The first one is called Qwikmed. That's spelled Q-w-i-k-m-e-d. The second company is called NY Greater Records Retrieval.

                  Mr. Bogoraz and Mr. Rose told the banks that these two companies were for medical consulting, and the purpose of setting up these shell companies was to hide the fact that these kickbacks were the proceeds of bribery, and included within that Mr. Bogoraz wrote checks from his law firm to these companies. He recorded on the checks that these checks were for medical records, which of course was false. That's the very simple basis for the money laundering charge.

As you mentioned, defense counsel's been in possession of all the Rule 16 for this charge. We think defense counsel can take a look at the bank records already produced, and those have all the relevant checks, as well as the incorporation documents, and what was reported to the banks as to the purpose of the companies.

(Exhibit A: Transcript of December 12 conference, at pages 10-12)

In its statement at the conference, the Government introduced specific allegations for the first time, including accusations that separate payments, in the form of "kickbacks," were allegedly made to Anthony Rose through the use of at least two companies not mentioned before in the context of this case, Qwik Med and NY Greater Records Retrieval, that Mr. Bogoraz and Rose allegedly communicated to "the banks that these two companies were for medical consulting," and that payments to these companies that were earmarked for "medical records" were in reality for the purpose of concealment laundering. The bank accounts relating to both Qwik Med and NY Greater Records Retrieval are therefore central to the money laundering case, (where they were not of similar concern when the case was only about Travel Act bribery). However, it turns out that the bank records of these companies, and a third company called Weitz Marketing, were not provided in the Government's discovery, even though the Government assured the parties and the Court that no additional discovery would be required on any material aspect of the new charge.

Leading up to the December 12 conference, the Government had indeed also assured the Court, in a letter filed December 1, (attached hereto as Exhibit D), that the new laundering charge against Mr. Bogoraz, (that was yet to be even filed), "will not

result in any additional Rule 16 disclosures and there will not result in any delay of the

trial." As set forth below in more detail, this was not true.

## ARGUMENT POINT II:

### THE GOVERNMENT'S FAILURE TO PROVIDE THE COMPLETE RECORDS FOR THE SUBJECT BANK ACCOUNTS IS A MATERIAL OMISSION THAT WILL PREVENT MR. BOGORAZ FROM DEFENDING THE NEWLY ASSERTED MONEY LAUNDERING ALLEGATION AND FOR WHICH ADDITIONAL TIME IS NEEDED

After the December 12 conference where the Government first identified

Qwik Med and NY Greater Records Retrieval as the vehicles of the alleged money

laundering allegations against Mr. Bogoraz, Mr. Bogoraz and counsel conducted an

expedited review of the discovery to determine the scope of evidence provided that

related to the money laundering charges as they had only just been described by the

Government.[4] In the context of Mr. Bogoraz's anticipated defense to the bribery Travel

Act charge, these entities, and their underlying records, were of little concern to the

defense. They are, however, central to Mr. Bogoraz's defense against the newly asserted

money laundering charge.

The preliminary review of the discovery by the defense revealed that the

Government has failed to produce, among other things, the majority of financial records

---

[4] As we noted at the December 12 conference, a reexamination of the discovery for the purpose of identifying material deficiencies in the Government's production in regard to the money laundering charges and Mr. Bogoraz's defense is a highly time-intensive task and in itself not reasonably possible during the last month before trial when pre-trial materials are required to be prepared and a separate review of what is expected to be an unusually voluminous amount of 3500 material is expected to be received (which has yet to be produced). Early on in the litigation, the Government described the unusual volume of discovery, for which the defendants were required to hire a "discovery coordinator." In February 2022, the Government described discovery as "voluminous," consisting of "discovery from <u>United States vs. Rose</u>, 19 CR 789, to the parties, as well as a large tranche of new discovery which includes approximately 15 iCloud backups of phones; approximately 43 e-mail accounts and information from those accounts; cell site data for approximately ten individuals; and then we have a large volume of subpoena returns from banks, phone records, insurance companies, patient records and the like. So it is indeed a large volume." (See Transcript, Court conference on February 1, 2022, at *ECF* 48, page 6)

relating to the central vehicles of alleged money laundering through which the requisite financial transactions supposedly took place that are at issue raised by the new charge. The absence of such records prevents Mr. Bogoraz from defending against the money laundering charge.

On December 15, we emailed the Government a proposed "meet and confer" requesting a bill of particulars for the money laundering charge and its response to several inquiries regarding the scope and completeness of its discovery.  (See Exhibit E, email exchange)  In response to the request for a bill of particulars, the Government stated

> Bogoraz (vis-à-vis Bogoraz Law Group and Instant Capital Partners) is the payor. The payees are primarily Qwik Med and Greater NY Records Retrieval. Weitz Marketing received small payments as well. The unlawful activity is bribe proceeds (as specified in the indictment). Money laundering does not require an overt act, so request#4 does not seem pertinent.

(Exhibit E)

In its response, the Government therefore added yet another entity for the first time, Weitz Marketing, that it neglected to mention at the December 12 conference. In response to our requests to clarify if the complete records of Qwik Med, Greater NY Records Retrieval and Weitz Marketing had been produced, (because it was apparent from our reexamination of the discovery that they had not), the Government responded: "We have produced what is in our possession from account inception through the date of the subpoena. As a courtesy, we are producing a financial schedule as well."

Our review of the discovery shows that, for instance, with respect to Qwik Med, only four months or information appear to have been produced, from May to August of 2017 (even when the range of the money laundering charge is from 2016 – 2019).  These materials were found in a folder entitled "Subpoena Returns" under further

subfolders "TD Bank" >> "TD Bank 2017 Rose, Cruz, Coles" >> "4341797904," which is the only TD account in the folder that appears to relate to Anthony Rose and Qwik Med.  In another folder entitled "TD Bank Rose, Chamers, Weiss, Luxury Blue," there are no relevant materials other than a subpoena by the Government to TD Bank for bank records relating to Anthony Rose, dated January 13, 2017.

But with respect to Greater NY Records Retrieval and Weitz Marketing, we simply could not locate any financial records at all.  Yet, when we sought further clarification from the Government in our meet and confer – by simply asking, for instance, for the Government to confirm whether the records had been produced or not so that we could know whether we had overlooked them in the voluminous discovery – the Government declined to offer a confirmation either way but instead said it would produce "financial schedules" to address the issue. (See Exhibit E)  On December 18, the Government then produced, without further explanation, sprawling Excel spreadsheets that it called "Financial Schedules," which appear to be internally made records by its own staff, without the underlying actual bank records, describing portions of its review of records.  (See Exhibit F, Government's cover letter dated December 18)  But even according to these internally drafted spreadsheets, it is clear that the Government's production, by its own silent concession apparently, did not include the financial records of the very entities that it is alleging were the vehicles of the money laundering. Additionally, the Government conceded over the email meet and confer that it was still "working to produce the check images" for several of the accounts, (which was never mentioned before in any of its statements to the Court about the completeness of its

discovery).  (See Exhibit E)  Nevertheless, the Government would not indicate the scope of time frame of these checks that are supposedly forthcoming.

The complete financial records for the three entities are necessary for Mr. Bogoraz's defense to the Government's allegations of laundering through these entities. For instance, the records will show all of the payors into these companies, which will include many payors aside from himself, including numerous law firms.  The identities of these payors and amounts they paid, including the dates and intervals of such payments, are necessary, because the defense will then interview these payors as potential witnesses on his behalf to testify as to their reasons and intentions for the payments.  The possibility of this testimony being exculpatory is high, because the overwhelming majority of such payors were never charged with any crimes, including money laundering and using these entities as vehicles to conceal "kickbacks."  This will be a defense to the allegation that these entities were opened for the purpose of laundering. (See, e.g., Exhibit A, at pages 10-12, in which the Government claimed that "the purpose of setting up these shell companies was to hide the fact that these kickbacks were the proceeds of bribery")  The nature of the payments into these companies, including the testimony of all the different payors, will show that payments to these companies were not for kickbacks, but for legitimate services, and the payors additionally need to be identified and interviewed as to what they received in return for their payments – since it is the Government's allegation that they may have claimed to be paying for medical records that they supposedly never received.  Yet Anthony Rose in fact purportedly owned and managed at least two medical clinics, which had medical records, so the testimony of the payors into

the supposed shell corporate entities would be shown to be legitimate if the payors said that they in fact received medical records in exchange for their payments.

Additionally, the checks themselves, (which the Government has conceded are still forthcoming), will further show the nature and identity of the payors, but also, the back of the checks will show how and where such payments were disbursed. The Government claims that Mr. Bogoraz "recorded on the checks that these checks were for medical records, which of course was false. That's the very simple basis for the money laundering charge." (Exhibit A, at pages 10-12)  But the backs of the checks are required to show whether such checks were indeed  deposited into, for instance, one of Anthony Rose's medical officers that he operated, which indeed would have medical records.  The manner of the disbursements from these accounts, and targets that received them, will show what these corporate entities were really used for, and whether such purposes were legitimate or not.  The complete records are required to also determine the total amount of proceeds that traveled through these entities, and the time and dates they did so.

If the Government should argue in response to this motion that there is still time for Mr. Bogoraz to obtain these records on his own, such a claim is a red herring and beside the point, because the Government assured the Court that its production had been complete on the central issues raised by the money laundering charge, and the Court denied Mr. Bogoraz's adjournment request based on this representation alone, which was not true.  If Mr. Bogoraz had been charged with the money laundering count earlier in this litigation, he would have been aware of the Government's theory involving Qwik Med, Greater NY Records Retrieval and Weitz Marketing, and indeed would have

obtained the records himself, if not from the Government.  But obtaining them on the eve

of trial, through either Mr. Bogoraz's efforts or more properly by the Government's, still

will prevent him from properly investigating the leads from those records, namely, the

nature of the transactions and the identity of witnesses (other law firms) that paid into

those accounts.  Instead, the Government hand-picked a small subset of these records,

which effectively restricts the identity and number of payors into those accounts that are

accessible to Mr. Bogoraz as possible witnesses, either of an investigative or testifying

nature.


**ARGUMENT POINT III:**

**AN ADJOURNMENT IS NEEDED TO INVESTIGATE NEW MATTERS THAT HAVE ONLY RECENTLY COME TO THE ATTENTION OF THE DEFENSE, WHICH MR. BOGORAZ IS ENTITLED TO AND ARE NECESSARY FOR IMPEACHMENT OF THE CENTRAL COOPERATING WITNESS**

Mr. Bogoraz also seeks a reasonable adjournment to permit his defense to

investigate potentially critical areas of impeachment of the central cooperator, Anthony

Rose, for which the Government has indicated it will be unable, or unwilling, to provide

information, and for which has only become apparent a few weeks ago.

As we previously noted at the December 12 conference, we have received

information from a private investigator that was informed by an NYPD Detective in the

61st Precinct that Anthony Rose is a person of interest in a shooting that took place while

he has been out on bail, on or around February 2022 in Brooklyn.  (See Declaration of

Edward Dowd, attached as <u>Exhibit G</u>)[5] This information was only first learned earlier this month on December 8, and immediately raised at the ensuing conference December 12. (Exhibit A, at pages 9-10)  We then raised it again with the Government on December 15 in our email "meet and confer" requesting the production of all materials relating to the Government's knowledge of Rose's involvement.  (See <u>Exhibit E</u>, email exchange) But the Government indicated in its response that it has not conducted any investigation of Anthony Rose for the shooting – even after we put it on notice of the issue – and does not intend to make any production in that regard, stating "the prosecution team is not in possession of such materials."[6]  (<u>Exhibit E</u>)

To begin, we submit that he the Government's interpretation of the scope of its prosecution team is overly narrow to avoid its <u>Brady</u> and <u>Giglio</u> obligations.  There is little question that the NYPD was part of its prosecution team and that materials must exist in the 61st Precinct, and most likely other departments as well.  Anthony Rose is the chief cooperator in a major NYPD corruption case, and when he was arrested, it was clear that the NYPD played an integral part in the investigation.

---

[5] Indeed, when Anthony Rose was arrested in this case, police found him in possession of an illegal firearm, which he then later pled guilty to, after having been convicted of possessing another illegal firearm previous to that.

[6] The Government's failure to investigate the allegations raised about Anthony Rose by counsel, once on notice, constitutes an undisclosed material benefit given to Mr. Rose for his cooperation that Mr. Bogoraz should also be entitled to explore and utilize during impeachment of his testimony.

For instance, at that time of Rose's arrest, James P. O'Neill, the NYPD

Commissioner at the time, stated:

> Corruption, in all forms, is intolerable within the NYPD and we
> continue to work with our law enforcement partners to expose these
> sorts of schemes. Insurance fraud costs companies and policy holders
> millions upon millions of dollars a year and I want to thank the FBI,
> the U.S. Attorney's Office in the Southern District of New York, the
> New York State Police, the National Insurance Crime Bureau, the
> NYC Department of Financial Services, the Westchester County
> D.A.'s office and our NYPD investigators who brought justice for
> victims in this case.

(Exhibit H, press release)

It need not be said that the core of any prosecution is the Government's

obligation to produce "evidence favorable to an accused . . . where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).   This obligation also includes

evidence that can be used to impeach a government witness.  United States v. Giglio, 405

U.S. 150, 154-55 (1972).   In this regard, a defendant is entitled to exculpatory or

mitigating evidence in the Government's possession, including evidence pertinent to a

material witness's credibility or reliability.  Perkins v. LeFevre, 642 F.2d 37, 40 (2d Cir.

1981).

Further, "the Government's obligations under Brady encompass not only

information that is admissible in its present form but also material information that could

potentially lead to admissible evidence favorable to the defense."  United States v.

Meregildo, 920 F. Supp. 2d 434, 438-39 (S.D.N.Y. 2013) (citing United States v.

Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007)).  "This obligation is designed to serve the

objectives of both fairness and accuracy in criminal prosecutions." Rodriguez, 496 F.3d at 225.

On a general level, it is true that the prosecutor's disclosure obligations "extend only to material evidence . . . that is known to the prosecutor." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). But where the prosecutor's case involves the joint investigation of several different agencies, as is the case here, the prosecution's Brady obligations are constructive, and the "prosecution is presumed to know all information gathered by his office in connection with his investigation. Id.

This duty is triggered by any joint investigation conducted between federal, state, and local agencies or across different federal agencies. See United States v. Paternina-Vergara, 749 F.2d 993, 997-998 (2d Cir. 1984).

While we submit it is the Government's obligation here to produce all materials about the shooting to the defense because the NYPD has considered Anthony Rose a person of interest, additional time is needed for the defense to conduct its own investigation based on that information, (and especially if the Government declines to produce any material at all). The additional time to investigate on behalf of the defense is justified due to the fact that the NYPD investigation of its chief cooperator in an NYPD corruption case has taken place during the pendency of the prosecution of Anthony Rose.

Additional time is also justified for the defense to investigate the circumstances of Anthony Rose's bail and how he has been permitted to stay at liberty while there is now reason to believe that the source of the proceeds that were posted were from an illicit source, mispresented to the Government and the Court, and, at least with

respect to the house from his mother who has since passed away, of questionable or minimal collateral value.  (See Exhibit G, Declaration of Edward Dowd)

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendant respectfully requests reconsideration of the Court's denial of his motion for a trial adjournment, and upon reconsideration, granting a reasonable adjournment to address and investigate the matters raised herein.

Dated: New York, New York
       December 24, 2023

_____/s_____
Aaron M. Rubin, Esq.

99 Wall Street Suite 1130
New York, New York 10005
Tel.: (212) 725 - 4600
arubin@amresquire.com
*Counsel for Arthur Bogoraz*