UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                     :

UNITED STATES OF AMERICA          :

     -v.-                                       :        S3 22 Cr. 19 (PGG)

WILLIAM WEINER and             :
ARTHUR BOGORAZ,                  :

             Defendants.         :

------------------------------------------------------------- x

# GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE
# PROPOSED EXPERT LEGAL OPINION TESTIMONY

 

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Mathew Andrews
Qais Ghafary
Michael Lockard
Assistant United States Attorneys
    *-Of Counsel-*

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in support of its motion to exclude proposed expert legal opinion testimony by the defendant William Weiner. Weiner proposes to call an attorney to opine, among other things, that "the foundational business documents of Nexray Medical Imaging, P.C. (Nexray) do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela* to withhold reimbursement for no-fault claims that were 'provided by fraudulently incorporated enterprises to which patients have assigned their claims.'" As discussed below, Weiner's proposed expert testimony should be excluded because (i) it consists of inadmissible legal opinion; (ii) relies on an incorrect legal standard that would be confusing to the jury; (iii) does not fit the facts of this case; and (iv) based on these incorrect legal standards and incomplete facts, implies conclusions of ultimate fact that are for the jury.

## BACKGROUND

### I.     The Charged Offenses

Weiner is charged in the Third Superseding Indictment (Dkt. Entry No. 282) (the "Indictment") in four counts with conspiring to commit healthcare fraud in violation of 18 U.S.C. § 1349 (Count One), healthcare fraud in violation of 18 U.S.C. § 1347 (Count Two), conspiring to launder the proceeds of healthcare fraud in violation of 18 U.S.C. § 1956 (Count Three), and conspiring to defraud the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 371 (Count Seven).

As described in the underlying second superseding indictment (Dkt. Entry No. 191), Weiner conspired with Bradley Pierre and others to defraud no-fault vehicle insurance providers by, among other things, funneling automobile accident victims to medical clinics, including an MRI imaging facility called Nexray where Weiner practiced, which were in fact controlled by

Pierre, a non-physician, in violation of New York state law. Dkt. Entryu No. 191 ¶¶ 10(b), 14-15, 19. Pierre exercised actual ownership and control over Nexray by, among other things, receiving the majority of Nexray's proceeds, controlling Nexray's bank accounts, influencing the hiring and firing of Nexray employees, identifying locations for Nexray's facilities, negotiating rent for Nexray's leases, and choosing the attorneys who would represent Nexray and Weiner in depositions. *Id.* ¶ 19. Weiner further conspired to provide falsified MRI reports for patients referred by Pierre's network, *id.* ¶ 20; and to lie in Examinations Under Oath ("EUOs") in disputes with no-fault insurers. *Id.* ¶ 21.

## II.     Weiner's Expert Disclosure

On or about December 22, 2023, Weiner provided the Government with an expert disclosure pursuant to Rule 16(b)(C) for Mark H. Zafrin, Esq., an attorney practicing in the area of healthcare real estate, finance, and mergers and acquisitions. *See* Ex. A (expert disclosure) & B (qualifications of Mr. Zafrin). Weiner proposes Mr. Zafrin will testify that it is his opinion that:

- The foundational business documents of Nexray Medical Imaging, P.C. (Nexray) do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela* to withhold reimbursement for no-fault claims that were "provided by fraudulently incorporated enterprises to which patients have assigned their claims." (Ex. A at 1 & 5).

- The organizational documents, loan agreements, lease agreement, and UCC filings all suggest that Dr. Weiner owned and controlled his practice. The Financing Agreement between Nexray and Medical Reimbursement Consultants, Inc. (MRC), does not provide any mechanism that would have allowed MRC to assert control over Nexray or the practice of medicine. (*Id.* at 1 & 5).

- There is a standard practice followed by legal practitioners in the Healthcare Space that would be followed when forming a radiology practice to ensure that the Practice is compliant with all Anti-Kickback, Stark, and (when relevant) no-fault laws. (*Id.* at 2).

- There is no Management Services Agreement between Dr. Weiner and MRC [and in] the absence of such an Agreement, Dr. Weiner retained complete authority to control hiring, firing, borrowing, spending, and every other aspect of the Practice. (*Id*. at 3).[1]

- Dr. Weiner assumed the entire financial risk of the success or failure of the Practice as conclusively demonstrated by his formation of Nexray and the lending agreements with Valley National Bank and others for MRI Equipment, computers, and other assets. (*Id*. at 4).

- The sublease for office space is between Nexray and Marvin Moy M.D., P.C. The only party responsible for payment is Dr. Weiner. The lease has specific and fixed provisions regarding the payment of rent, taxes, and electricity, and all payments were made to Marvin Moy M.D. PC. (*Id*.).

- Nexray's foundational documents and business structure are neither consistent with nor suggestive of a possible *Malella* violation. (*Id.*).

- The Funding Agreement here provided that MRC would advance payment on accounts receivable. Per the Agreement, the accounts receivable served as collateral for the advances. Nexray was obligated to repay the amounts funded plus interest, but only to the extent that it actually collected the accounts receivable. (*Id.*).

- The Finance agreement did not grant MRC any form of legal control over Nexray. (*Id*.).

- Nexray's foundational documents are not in any way similar to those of a "doc-in-a-box" clinic; rather, they appear to be consistent with a legitimate PC controlled by a physician. (*Id*.).

Mr. Zafrin's proposed opinions are based solely on the following documents: (1) Nexray Entity Information from the New York State Department of State; (2) a 2015 agreement for Nexray's purchase of an MRI machine; (3) a 2015 sublease between Nexray and Marvin Moy MD, PC; (4) a 2016 Nexray bank loan agreement; (5) a purported 2016 financing agreement between Nexray and Pierre's company, Medical Reimbursement Consultants ("MRC"); and (6) UCC filings for security interests in various Nexray assets. (*Id*. at 1-2).

---

[1] Though Mr. Zafrin bases his opinion in part on the absence of a management services agreement between Nexray and MRC, Nexray claimed payments to MRC totaling approximately $5.28 million as deductible management fees in its 2017, 2018, and 2019 tax filings. It is the Government's contention that the characterization of these payments as management fees was false and in fact reflects MRC's effective ownership and control of Nexray, but this fact serves to highlight the flaws in Mr. Zafrin's proposed opinion testimony.

3

## DISCUSSION

I.  **Relevant Law**

Federal Rule of Evidence 702 provides that expert testimony that "assists the trier of fact to understand the evidence or to determine a fact in issue," may be admitted if "the testimony is based on sufficient facts or data," and "is the product of reliable principles and methods" that have been reliably applied "to the facts of the case."

The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (cleaned up). In particular, as the Second Circuit has noted, "[u]nder Rules 701 and 702 [of the Federal Rules of Evidence], opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence that wastes time." *Hygh*, 961 F.2d at 363 (internal quotation omitted).

-In fulfilling this gatekeeping role, the Court should first determine whether the proffered expert testimony is relevant: whether it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Next, the court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up).

It is "the exclusive province" of the trial judge "to instruct the jury on the law." *Hygh* v. *Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). Accordingly, "an expert's testimony on issues of law is inadmissible." *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (internal quotation marks omitted). Because it is the Court's role to instruct the jury on the requirements of the law, the Second Circuit has cautioned that "it would be very confusing to a jury to have opposing opinions of law admitted into evidence as involving a factual question for them to decide." *United States* v. *Ingredient Tech. Corp.*, 698 F.2d 88, 97 (2d Cir. 1983).

In this regard, the Second Circuit "is in accord with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion," or "communicat[es] a legal standard -- explicit or implicit -- to the jury," since it is "the exclusive province" of the trial judge "to instruct the jury on the law." *Hygh,* 961 F.2d at 363-64 ("experience [of an expert] is hardly a qualification for construing a document for its legal effect"); *see United States* v. *Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *Ingredient Tech. Corp.*, 698 F.2d at 97 ("Questions of law are for the Court."). The Circuit has also warned of "[t]he danger . . . that the jury may think that the 'expert' in the particular branch of the law knows more than the judge -- surely an inadmissible inference in our system of law." *Hygh*, 961 F.2d at 364 (quoting *Marx*, 550 F.2d at 512).

## II.  Application

Almost all of Mr. Zafrin's proposed opinion testimony consists of inadmissible legal opinion that must be excluded under Rules 702 and 403. This includes his opinions about the terms and meanings of contracts, loan agreements, lease agreements, and UCC filings, including Mr. Zafrin's opinions about what powers, rights, and obligations those documents confer and what

5

conclusions can be drawn from those documents. *See* Ex. A at 1 (opining that various legal documents "suggest that Dr. Weiner owned and controlled his practice"), 3 (opining on the legal effect of the absence of a management services agreement), 4 (opining on the meanings of lending, leasing, and financing agreements), & 5 (concluding from legal documents that the operation of Nexray complied with *Malella*). These legal opinions are all inadmissible. *See Richards v. Direct Energy Servs. LLC*, 915 F.3d 88, 98 (2d Cir. 2019) ("unless the words or phrases [in a contract] . . . are terms of art," expert testimony "regarding the meanings of contractual provisions [is] irrelevant and hence inadmissible") (alterations in original, quoting 31A Am. Jur. 2d *Expert and Opinion Evidence* § 294 (2018)); *Marx & Co. v. Diner's Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) (proposed expert testimony on the meaning of contract terms was inadmissible). Nor may Mr. Zafrin opine on whether documentary evidence shows the absence of a violation of law. "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. Mr. Zafrin's opinions about whether certain evidence does or does not show a *Malella* violation is inadmissible legal opinion. *See* Ex. A at 1, 4 & 5.

Indeed, Mr. Zafrin's proposed opinion testimony is particularly problematic because it is based solely on his review of a particular, limited set of documents: a handful of incorporation records, loan and lease agreements, and UCC filings. To satisfy the requirements of Rule 702, proposed expert testimony must "fit" the facts of the case at issue. *See, e.g.*, *LVL Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641-42 (S.D.N.Y. 2016) (Noting that "the testimony must be both reliable *and* relevant in that it 'fits' the facts of the case" and finding proposed expert testimony "fails the *Daubert* 'fit' requirement.") (emphasis in original). By arbitrarily limiting the facts he considered, Mr. Zafrin's testimony fails this test.

Moreover, Mr. Zafrin's analysis of a purely documentary record is exactly the kind of formalistic analysis that the Court of Appeals, in *Mallela*, and the Second Circuit, in *Gabanskaya*, have held is inappropriate. "[N]ominal or 'paper' ownership is not enough for compliance with the regulatory scheme." *United States v. Gabinskaya*, 829 F.3d 127, 133 (2d Cir. 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 319 (2005)). "Since *Mallela*, other federal and state courts in New York have reaffirmed the understanding that 'ownership' of a PC within the meaning of the no-fault insurance laws looks to the *realities of actual control of the PC*, including the economic risks and benefits of the enterprise, as well as the formal indicia of ownership, and that misrepresenting ownership status for purposes of securing insurance reimbursement constitutes fraud." *Gabinskaya*, 829 F.3d at 133-34 (emphasis supplied). Mr. Zafarin's opinions, relying on incorrect legal principles, invades the Court's province, would be prejudicial and confusing to the jury, and therefore are also excludable under Rule 403.

Because Mr. Zafrin's opinion is so narrowly limited—*i.e.*, by only relying on the "paper" relationship between Nexray and MRC without understanding the realities of control of the business—it neither "rests on a reliable foundation" nor is "relevant to the task at hand." *Pfizer Inc. Secs. Litig.*, 819 F.3d at 658; *LVL Brands*, 209 F. Supp. 3d at 641-42. For instance, the evidence will show that the that the kinds of documentation that Mr. Zafrin relies upon, particularly the purported financing agreement between Nexray and MRC, were fictious and designed to conceal, rather than define, the true economic and control relationship between Pierre and MRC on the one hand and Weiner and Nexray on the other. The evidence at trial will demonstrate that there is no relationship whatsoever between Nexray's payments to MRC and the terms of the financing agreement. As noted above, Mr. Zafrin's opinion rests in significant part on the purported absence of a management services agreement between MRC and Nexray, yet Nexray

claimed approximately $5.28 million in payments to MRC between 2017 and 2019 as "management fees" in tax filings, and in email exchanges Weiner described Bradley Pierre as his "practice manager."

Finally, Mr. Zafrin proposes to opine that there is a "standard practice followed by legal practitioners in the Healthcare Space that would be followed when forming a radiology practice to ensure that the Practice is compliant with all Anti-Kickback, Stark, and (when relevant) no-fault laws." Ex. A at 2. Standards of practice in an industry can be admissible when relevant to the issues at trial and helpful to the jury. However, Mr. Zafarin's opinions about industry standard practices followed by *legal practitioners* is not relevant to determining whether the defendant, a medical practitioner, participated in a healthcare fraud scheme. It also "communicat[es] a legal standard -- explicit or implicit -- to the jury," contrary to Rules 403 and 702. *Hygh,* 961 F.2d at 363-64. Moreover, "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *Bilzerian*, 926 F.2d at 1295. Mr. Zafrin's opinions about the industry standards followed by legal practitioners in "forming a radiology practice" are not relevant or helpful to the jury.

Simply put, counsel is free to documents into evidence and argue to the jury that there is no *Mallela* violation in their summations. However, counsel cannot call another attorney to offer a factually and legally flawed defense argument of the facts in this case and the decisions in *Mallela* and *Gabinskaya* under the guise of an "expert."

## CONCLUSION

For the foregoing reasons, the proffered legal opinion testimony of Mr. Zafarin should be excluded.

Dated: New York, New York
January 5, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York

                               By:      /s/
                                        Mathew Andrews
                                        Qais Ghafary
                                        Michael Lockard
                                        Assistant United States Attorneys
                                        Southern District of New York

**EXHIBIT A**

# Expert Witness Report of Mark H. Zafrin, Esq

1. **Identity of Expert Witness:** Mark H, Zafrin, Esq., 214 East Ninth Street, New York, New York 10003; Phone: (212) 673-5505; Cell (917) 922-7120 -mail: mzafrin@me.com|

2. **Opinions and Reasons Therefore:** Based on the information presented at the current time and for the reasons set forth below, it is my **opinion** that the foundational business documents of Nexray Medical Imaging, P.C. (Nexray) do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela* to withhold reimbursement for no-fault claims that were "provided by fraudulently incorporated enterprises to which patients have assigned their claims." Specifically, the organizational documents, loan agreements, lease agreement, and UCC filings all suggest that Dr. Weiner owned and controlled his practice. The Financing Agreement between Nexray and Medical Reimbursement Consultants, Inc. (MRC), does not provide any mechanism that would have allowed MRC to assert control over Nexray or the practice of medicine.

   During my 35 years of practice, I have extensive experience with incorporating PCs and PLLCs. I am familiar with "doc-in-a-box" clinics (in which businessmen essentially pay for the use of physicians' licenses so that they can fraudulently incorporate as medical PCs, skirting State laws proscribing the corporate Practice of medicine). Nexray's foundational documents are not in any way similar to those of a "doc-in-a-box" clinic; rather, they appear to be consistent with a legitimate PC controlled by a physician.

3. **Data Considered in Forming the Opinion:** I relied upon the following documents in forming my opinion.

   a. Entity Information from the New York State Department of State indicating that Nexray Medical Imaging was formed on April 19th, 2011, by William A. Weiner, D.O., with an address at his home, 8 Leonard Drive, East Rockaway, New York, 11518

   b. Oxford Instruments Healthcare purchase agreement and Oxford Instruments Healthcare service agreement for an MRI Machine dated November 15th, 2015, between Oxford Healthcare and Nexray Medical Imaging.

   c. Sublease Agreement dated 2015 between Marvin Moy MD., P.C. and Nexray for a portion of premises 79-60 South Conduit Avenue, Howard Beach, New York, which JSB Realty No. 2, LLC owns the Automated City Register System.

   d. Six Hundred Fifty Thousand ($650,000.00) draw term loan from Valley National Bank dated February 2, 2016, with a personal loan guarantee by Dr. William Wiener, the proceeds designated explicitly for purchasing equipment and leasehold improvements.

   e. Financing Agreement (the "Agreement") dated as of November 15, 2016, between Nexray and MRC.

   f. UCC Search on the New York State Department of States Website which revealed the following UCC filings:

   i. Filing # 201602125175402 dated 02/12/2016 between Valley National Bank as the lender and Nexray Medical Imaging, P.C, an all assets filing

   ii. Filing # 201805175607269, dated 05/17/2018 between Philips Medical Capital, LL and Nexray Medical Imaging, P.C, securing a purchase by Nexray of One (11 Philips Ingenuity TF 128 PET/CT System, Serial No. 2078, as fully described on Philips Healthcare Quotation No. 1-1 RSRL2I and One (1) Siemens RS Magnetom Skyra Eco MR System as fully described on Siemens Quote No. 1-1 MLRWN8, together with all components, additions, upgrades, attachments, accessions, substitutions, replacements, and proceeds.

   iii. Filing Number 20180928621231, dated 09/28/2018, benefiting TIAA COMMERCIAL FINANCE, INC, securing the purchase of 1 EXA PACS SOFTWARE, DELL RACK SERVER R730, 1 DUAL 3MP MONOCHROME DIAGNOSTIC WORKSTATION and all accessions thereto, substitutions and replacements therefor, and all proceeds of the preceding, including insurance proceeds.

   iv. Filing Number 201908236085136, dated August 23, 2018, benefiting SIEMENS FINANCIAL SERVICES, INC. For the purchase of an MRI machine.

## OPINION

1) **STANDARDS FOR PRACTICE**. There is a standard practice followed by legal practitioners in the Healthcare Space that would be followed when forming a radiology practice to ensure that the Practice is compliant with all Anti-Kickback, Stark, and (when relevant) no-fault laws.

   a) Licensed medical professionals must own the PC or PLLC. The PC or PLLC is allowed for convenience's sake for the business activities of the Practice, but the Doctor is still personally responsible for all medical decisions.

   b) The Practice must have complete control over all of its assets and independent control over the management, policies, and disposition of assets. It must have the ability to incur debts, to enter into any agreements with third parties, and to hire and fire employees

   c) The Physician must make capital contributions and be the sole signatory on all loans and debts.

   d) The Physician must not share in the rewards of the Practice, and either seems to split medical fees or profits with a non-physician-physician.

2) **STANDARD CONSTRUCTION RULES WHERE A NON- PHYSICIAN WANTS TO ENGAGE IN PRACTICE MANAGEMENT OF A RADIOLOGY CLINIC.** Many times, I and other attorneys in this area have been approached by entrepreneurs who believe they can team up

with a radiologist and actively be involved in a radiology practice as a non-physician owner. The challenge that the attorney faces in advising the client is to encourage and guide the client into an arrangement with a physician that is a genuine management agreement without the appearance of or actual impropriety. However, the Practice is often still a "doc in a box". These arrangements are made through the mechanism of the non-physician-physician promoter doing the following:

a) The non-physician promoter will form a Management Services Company and enter into a contract with the PC where the Doctor who owns the PC is effectively an employee of the non-physician's-physician's management company.

b) The Management Services Company handles all of the financial aspects of the business

   i) The Management Services Company arranges for and sometimes guarantees bank loans and equipment leases.

   ii) The Management Services Company arranges equipment leases or purchase equipment in their name and re-lease them to the Practice at an inflated price over and above the actual cost.

   iii) The Management Services Company enters into leases for space in the name of the Management Company and then subleases the space to the Practice at an inflated rate while charging for incidentals on a cost-plus basis, such as cleaning, air conditioning, heat, etc.

   iv) The management agreement provides that all income from the Practice is deposited in an account totally under the control of the Management Services Company from which they make payments to all the employees, including mid-level medical and x-ray techs.

   v) The Management Services Company charges for billing and accounting services at an inflated rate.

c) The above is an example of the facts and circumstances among others that existed in the *Mallela* case and *United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016). The Management Services Company structure is problematic because it creates numerous opportunities for the Management Company to exercise control over the assets of the PC.

3) **NEXRAY FOLLOWED AN EXTREMELY DIFFERENT MODEL.**

   a) Dr. Weiner incorporated Nexray on April 19th, 2011, five years before he entered into the Sublease with Marvin Moy M.D., P.C., and the Financing Agreement (the "Agreement") with MRC.

   b) Notably, there is no Management Services Agreement between Dr. Weiner and MRC. In the absence of such an Agreement, Dr. Weiner retained complete authority to control hiring, firing, borrowing, spending, and every other aspect of the Practice.

    c) I am not aware of any evidence to suggest that Dr. Weiner was an absentee doctor, which, of course, is unlike to the fact patterns in *Mallela* and *Gabinskaya*.

    d) Dr. Weiner assumed the entire financial risk of the success or failure of the Practice as conclusively demonstrated by his formation of Nexray and the lending agreements with Valley National Bank and others for MRI Equipment, computers, and other assets. The UCCs filed by Valley National Bank and the sellers of the equipment, either on leases or financed purchases, demonstrate that the liens were for loans or equipment purchased solely by Nexray on Dr. Weiner's own credit. No one else was obligated to pay these debts.

    e) The cost of the fit-out and construction of the offices appear to have been financed by Nexray and Dr. Weiner personally, as demonstrated by the Six Hundred Fifty Thousand ($650,000.00) draw term loan from Valley National Bank, which Dr. Weiner personally guaranteed.

    f) The sublease for office space is between Nexray and Marvin Moy M.D., P.C. The only party responsible for payment is Dr. Weiner. The lease has specific and fixed provisions regarding the payment of rent, taxes, and electricity, and all payments were made to Marvin Moy M.D. PC.

        i) A check of the City of New York's electronic real estate filing system demonstrated that the owner of the building was in no way related to MRC, Bradley Pierre, or any of the other parties to this matter.

        ii) The use clause of the sublease restricted the use to a radiology practice and specifically excluded its use for physical medicine, rehabilitation, and other ancillary uses.

        iii) The work to fit out the space was either done by the Prime Landlord as part of the prime lease or by Nexray Medical Imaging at their sole cost and expense.

    g) In my opinion, Nexray's foundational documents and business structure are neither consistent with nor suggestive of a possible *Malella* violation.

4) **THE FINANCING AGREEMENT BETWEEN NEXRAY AND MRC IS USUAL AND CUSTOMARY**

    a) Many medical practices use factoring or other forms of lending to accelerate collections.

    b) Healthcare providers widely use factoring or funding agreements. These types of agreements can often be the least expensive capital for such providers. In addition, factoring or funding agreements are often used by providers who are reliant on payment from insurance companies. Because insurance companies can and often do refuse to pay in a timely manner (if at all) or raise issues as to whether or not the procedure was medically necessary, many providers seek to mitigate their risks through funding arrangements.

    c) The Funding Agreement here provided that MRC would advance payment on accounts receivable. Per the Agreement, the accounts receivable served as collateral for the advances. Nexray was obligated to repay the amounts funded plus interest, but only to the extent that it actually collected the accounts receivable.

    d) The Finance agreement did not grant MRC any form of legal control over Nexray.

5) **CONCLUSION:** It is my **opinion** based upon my expert knowledge in this area that:

    a) Nexray's foundational business documents do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela*, to withhold reimbursement for no-fault claims that were "provided by fraudulently incorporated enterprises to which patients have assigned their claims."

    b) Specifically, the organizational documents, loan agreements, lease agreement, and UCC filings all suggest that Dr. Weiner owned and controlled his practice. The Financing Agreement between Nexray and Medical Reimbursement Consultants, Inc. (MRC), does not provide any mechanism that would have allowed MRC to assert control over Nexray or the practice of medicine.

    c) Nexray's foundational documents are not in any way similar to those of a "doc-in-a-box" clinic; rather, they appear to be consistent with a legitimate PC controlled by a physician.

                                               Respectfully submitted.

                                               *Mark Zafrin*
                                               Mark H. Zafrin, Esq.

**EXHIBIT B**



mark.zafrin@offitkurman.com
929.476.0052 | Fax 212.545.1656
590 Madison Ave. | 6th Floor
New York, NY 10022



## MARK ZAFRIN
**Principal, New York Office**

### PRACTICE AREAS
- Business Law and Transactions
- Cannabis Law
- Healthcare Law

### PRACTICE FOCUS

Mark Zafrin, a firm principal, is a senior attorney in the firm's Corporate Department. Mark is one of the leading Healthcare real estate, finance and M&A lawyers in New York. In addition to mergers and acquisitions, his practice has focused on complex joint ventures, restructurings and corporate governance matters, primarily in the Healthcare space. He has over 35 years of experience negotiating and drafting sales and purchase agreements, loan preparations, equity securitization transactions (such as REITs), equity funds and partnership syndications of healthcare facilities. Mark is known for adroitly structuring transactions to maximize the benefits accruing to tax planning and financing promoters using an in-depth knowledge of 1031 Exchanges, Delaware Statutory Trusts and Series LLCs.

Mark is well known for counseling boards and senior management of Health Care Companies on critical governance issues, including risk management, restructurings, tax credit financing, use of Opportunity Zones and healthcare licensing applications, and other Federal and State regulatory matters, such as anti-kickback rules, Medicare and Medicaid audits. Mark specializes in loan workouts and forbearance and has successfully prevented many defaults and foreclosures on behalf of his clients.

Mark utilizes his in-depth knowledge of mortgage and asset-based financing vehicles, such as HUD and FHA-insured mortgages, and conventional, mezzanine and private equity financing, on behalf of his clients.

Mark received his J.D., *cum laude,* from New York Law School, where he was a staff member of the Law Review.

### REPRESENTATIVE MATTERS

- Leveraged a buyout of a 499-Bed Nursing Home in Manhattan (Dewitt Rehab) for $108M., including a $9M. Bridge to HUD from Key Bank.

- Subsequent HUD refinancing of Dewitt Rehab, the most significant single asset financing since the inception of the HUD 232 program at $127M.

- Refinance of Workmen's Circle MultiCare using a Delaware Statutory Business Trust, one of the most significant HUD loans ever on a single building in the agency's history, totaling $104M and still the first and only time that HUD has allowed a Delaware Statutory Trust to be a borrower.

- Obtained the approval for the first new construction of a Skilled Nursing Home in New York State, the $75M Epic Rehabilitation and Nursing at White Plains.

### PUBLICATIONS

- "Structuring the Offering of Physician Interests in a Multi-Specialty Ambulatory Surgery Center to Comply with the Anti-Kickback Law," Author, Journal of Health and Life Sciences Law, Oct. 2011
- "Preparing Offering of Interests in Ambulatory Surgery Centers to Physician-Investors," Author, Physician News, Jun. 2011

### EDUCATION
- New York Law School, J.D., cum laude
- St. John's University, B.A., cum Laude

### ADMISSIONS
- New York
- New Jersey District Court