UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

WILLIAM WEINER,

Defendant.

**ORDER**

22 Cr. 19 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this no-fault insurance fraud case, the Government moves to compel Defendant

William Weiner to supplement expert disclosures he has made concerning defense expert Dr.

Bryan Pukenas, pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.  (Govt. Br.

(Dkt. No. 309) at 2)[1]  For the reasons stated below, the Government's motion to compel will be

granted.

**BACKGROUND**

I.      **THE CHARGES AGAINST WEINER**

Defendant Weiner is a radiologist charged in connection with a long-running no-

fault insurance fraud scheme.  In the original indictment filed in January 2022, the Government

alleges that Dr. Weiner and his co-defendants participated in a scheme to obtain the identity of

motor vehicle accident victims via bribery, and then steer the accident victims to corrupt medical

clinics, which falsely represented to insurers that they were owned and controlled by physicians,

---

[1]  The page numbers of documents referenced in this order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

when in fact they were not.[2]  (Indictment (Dkt. No. 1))[3]  Weiner, for example, incorporated

Nexray Medical Imaging, PC ("Nexray") – a Magnetic Resonance Imaging or "MRI" facility –

which the Government alleges is actually owned and operated by Weiner's co-defendant Bradley

Pierre, who is not a physician.  (Id. ¶¶ 8(b), 17)

　　　　　The Government further alleges that Weiner's participation in the no-fault

insurance fraud scheme included falsifying clinical findings of injuries in MRI reports he

prepared at Nexray:

> The Specialists are licensed physicians who conducted the specialized medical
> care prescribed by the No-Fault Clinics, such as MRIs and X-rays.  The
> Specialists include, among others, WILLIAM WEINER, the defendant, who is a
> licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical
> Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme. WEINER
> falsified clinical findings of injury in MRI reports that were submitted to
> insurance companies.
>
> . . . .
>
> BRADLEY PIERRE and WILLIAM WEINER, the defendants, agreed to falsify
> clinical findings of injuries on MRI reports and pressure radiologists working for
> Nexray to exaggerate findings of injuries in their own reports.  These false clinical
> findings, in turn, allowed referring physicians and attorneys to bill for additional
> benefits under the No-Fault Law and obtain larger legal settlements and
> judgments.

(Id. ¶¶ 8(b), 18)

---

[2]  Under New York law, only medical clinics owned and operated by physicians may submit
claims for services provided under the no-fault insurance law.  See State Farm Mut. Auto. Ins.
Co. v. Mallela, 4 N.Y.3d 313, 321 (2005) (upholding New York State regulation permitting
insurers to deny reimbursement for no-fault claims submitted by medical clinics owned and
operated by non-physicians).

[3] The operative (S3) Indictment (Dkt. No. 282) is not a speaking indictment and does not allege
the same degree of factual detail as the original indictment.  (See Dkt. Nos. 1, 191)  However,
the Government has represented that it intends to prove up at trial the factual allegations
concerning Weiner set forth in the original indictment.  (Dec. 12, 2023 Tr. (Dkt. No. 322) at 15)

The Government and Weiner have retained physicians to offer expert testimony as to whether Weiner in fact falsified reported injuries on MRI reports.

## II.     WEINER'S DEMAND FOR PARTICULARS REGARDING HIS ALLEGEDLY FALSIFIED MRI REPORTS

On October 18, 2022, Weiner moved to dismiss or, in the alternative, for a bill of particulars, arguing that while the Indictment alleged that he had falsified "clinical findings of injuries in MRIs," "the Indictment does not identify even one case where Dr. Weiner allegedly falsified a diagnosis." (Weiner MTD Br. (Dkt. No. 107) at 2)  Weiner complained that – absent disclosure of which MRIs Weiner had allegedly falsified – the Government's charges were "'impermissibly vague.'  While operating Nexray, Dr. Weiner and his colleagues read thousands upon thousands of MRIs. . . . How can an allegation that Dr. Weiner agreed to falsify unspecified clinical findings possibly put Dr. Weiner on notice of that which he must defend?" (Id. at 5)

Weiner went on to explain that while the Government had "identif[ied] 40 instances in which it contended that Dr. Weiner falsified MRI readings," it had "reserve[d] its right to attempt to prove that Dr. Weiner falsified different MRI reports"  Weiner demanded that the Court require the Government to identify "[e]very instance . . . [in which] Dr. Weiner falsified an MRI reading or pressured another radiologist to falsify his or her reading of an MRI." (Id. at 9) (emphasis in original).

On November 15, 2022 – in response to Weiner's motion – the Government produced Dr. Coyne's supplemental expert report, which lists an additional 59 MRI reports that Weiner allegedly falsified, along with an explanation as to how each report was falsified. (Govt. MTD Opp. (Dkt. No. 142) at 29; Govt. Br. (Dkt. No. 309), Exh. B (Supp. Coyne Rpt.), at 38) This Court subsequently denied Weiner's demand for particulars, finding that the Government's disclosure of the two Coyne expert reports, countless witness statements, and interview notes

were adequate to apprise Weiner of the MRI reports that he had allegedly falsified and the nature of his falsifications.  (Oct. 24, 2023 Opinion (Dkt. No. 253) at 60-61 & n.14)

## III.   THE GOVERNMENT'S EXPERT DISCLOSURES

On April 13, 2022 – nineteen months ago – the Government provided Weiner with a 24-page expert report prepared by Dr. Scott Coyne, a radiologist, setting forth his findings concerning 40 MRI reports prepared by Weiner (the "Initial Coyne Report").  (Govt. Br. (Dkt. No. 309), Exh. A, at 13)  And on November 15, 2022 – as discussed above – the Government produced a 33-page supplemental report prepared by Dr. Coyne that addresses an additional 59 MRI reports prepared by Weiner (the "Supplemental Coyne Report").[4]  (Id., Exh. B, at 38)

The Government asked Dr. Coyne to review 99 "randomly selected" MRI reports prepared by Weiner.  (Id., Exh. A at 14, Exh. B at 39)  For each of the 99 MRI reports, Coyne conducted a "detailed initial assessment of all the images in each [MRI] study" and "formulat[ed] . . . diagnostic radiology opinions."  (Id. at 14)  Coyne then "reviewed [Weiner's] respective radiology report . . . and recorded [his] specific agreement or disagreement with the opinions stated in the radiology report of the particular exam."  (Id.)

In his expert reports, Coyne organizes the patients' MRIs into three categories: those showing (1) "Normal MRI Examination"; (2) "Mild Degeneration"; and (3) "Moderate to Advanced Degenerative Pathology."  (Id., Exh. A at 14, Exh. B at 40)  For each category, Coyne provides a paragraph-length summary explaining why he agrees or disagrees with the

---

[4]  Dr. Coyne was asked to review 60 MRI reports in connection with his supplemental report, but was not able to find a radiology report for one of the patients.  (Id., Exh. B at 39)  His report therefore addresses 59 MRI reports rather than the requested 60.  (Id.)

conclusions set forth in Weiner's MRI report for each patient.  (Id., Exh. A at 15, Exh. B at 40-41)

Coyne also sets forth his conclusions as to each individual MRI report in lengthy appendices attached to his two reports.  For each patient, Coyne records, inter alia, the patient's name[5] and age, a description of his observations and conclusions from the MRI images, and an explanation as to whether he agrees or disagrees with Weiner's diagnostic conclusions, as set forth in Weiner's MRI report.  (Id., Exh. A at 17-37, Exh. B at 43-71)  A representative example of Coyne's analysis with respect to each of Weiner's MRI reports is set forth below:

M████, M████████ Date of Birth: December 18, 1989 (29 years), "Pain status post injury" Lumbosacral Spine MRI January 8, 2019 @ Soul Radiology (labeled, 'M████, M████████') Multiple T1 and T2-weighted images were acquired in the axial and sagittal planes. There is no evidence of fracture, contusion, dislocation, subluxation or other osseous trauma. Vertebral column and facet joint alignment are normal. The discs are all normal in height, signal and morphology. There is no evidence of disc herniation, compromise of the spinal canal, compression or displacement of the cauda equina at any level. The central spinal canal and neural foramina are widely patent at all levels. Lordotic curvature is normal. The cauda equina is normal in signal and diameter. The nerve roots are normal in signal and diameter. Generalized bone marrow signal is normal. The paravertebral soft tissues are normal.

> ➤ Agree: L3 hemangioma (did not mention S1 hemangioma)
>
> ➤ DISAGREE:
>    1. Straightening of the physiologic lordosis consistent with pain and/or spasm
>    2. L3-4 right lateral disc herniation narrowing the foramen and abutting the nerve root
>    3. L4-5 right paramedian disc herniation impressing on the ventral surface of the thecal sac with its associated nerve roots

(Id., Exh. A at 17)  Coyne provides a similar analysis for each of the 99 MRI reports analyzed in his two expert reports.

In the Initial Coyne Report, Coyne states that "[i]n 39 of 40 cases my opinions were in substantial disagreement with the diagnostic findings contained in [Weiner's] radiology

---

[5] Patients' names are redacted in publicly filed material to include only first and last initials.

report." (Id. at 14)  Coyne further states that his review of the 40 MRI reports "demonstrated an overwhelming number of false positive diagnoses, and a clear pattern of false radiologic reporting of clinically significant diagnoses and other findings not present on the MRI images." (Id. at 16)  Coyne further opines that Weiner's "reports of these MRI examinations represent substantial departures from accepted standards of care in diagnostic radiology interpretation and communication." (Id.)

In the Supplemental Coyne Report, Coyne states that "[i]n 55 of 59 cases my opinions substantially disagreed with the radiologic findings and resultant diagnoses contained in [Weiner's] radiology reports" (Id., Exh. B at 39)  As in the earlier report, Coyne finds that the 59 MRI reports reviewed for purposes of the supplemental report "demonstrated an excessive number of false positive diagnoses in all patient categories." (Id. at 41)  Coyne further concludes that the 59 MRI reports "represent substantial departures from accepted standards of care in diagnostic radiology interpretation and communication." (Id. at 42)

## IV.   WEINER'S EXPERT DISCLOSURES

On December 22, 2023 – more than a year after the Government's disclosure of the Supplemental Coyne Report, in the midst of the holiday season, and less than a month before trial – Weiner produced a six-page expert report prepared by Dr. Bryan Pukenas.  (Pukenas Report (Dkt. 317-1) at 2)

Dr. Pukenas is an Associate Professor of Radiology and Neurosurgery at the University of Pennsylvania.  (Id.)  Weiner engaged Dr. Pukenas to (1) "offer opinions on standards and practices in radiology"; (2) "examine independently each of the radiological examinations and reports that Dr. Weiner conducted of the persons identified in the Report and Supplemental Report of Dr. Scott S. Coyne, and to assess independently Dr. Coyne's evaluations

of Dr. Weiner's reports (including his methodology)"; and (3) "offer [an] opinion as to whether

Dr. Weiner's work in these cases was consistent with the standard of care for a radiologist."  (Id.)

In connection with preparing his report, Dr. Pukenas reviewed the "original

MRIs" and Weiner's "interpretive reports" for the patients that Dr. Coyne reviewed, as well as

Coyne's two expert reports.  (Id.)  Dr. Pukenas also reviewed certain "clinical information" for

the selected patients that was purportedly "available to Dr. Weiner at the time he conducted the

initial reads for these patients."  (Id.)  Coyne did not review this "clinical information."  (Id.)

Dr. Pukenas concludes that Weiner's MRI reports are "within the standard of care

for radiologists," and that he "did not see evidence of a pattern of overreporting or exaggerating

findings."  (Id.)  Pukenas notes that

> academic studies show that radiologists often disagree regarding particular
> findings when reading MRIs (and that radiologists often disagree with themselves
> when reading the same scan at different times).  Here, although I disagreed with
> some of Dr. Weiner's findings, our level of disagreement was consistent with that
> which is reported in the literature and in line with my own experience as a
> practitioner.  Further, to the extent that I disagreed with Dr. Weiner, it was
> because, in nearly equal numbers, Dr. Weiner:  (i) made findings that I would not
> have reported; or (ii) failed to make findings that I would have reported (for
> example, Dr. Weiner consistently failed to report findings suggesting
> degeneration relating to the facet joint—a set of conditions that could cause pain,
> particularly if aggravated by trauma).  Similarly, I disagreed with Dr. Coyne's
> findings both because he made findings that I would not have reported and
> because he failed to make findings that I would have.  I should note that, in some
> instances, Drs. Weiner and Coyne both failed to identify findings that I would
> have made . . . .

(Id. at 1-2 n.2)

Unlike Dr. Coyne, Dr. Pukenas does not support his conclusions with a patient-

by-patient analysis setting forth his findings concerning individual MRI reports prepared by

Weiner.  In other words, Pukenas does not disclose on a patient-by-patient basis whether he

agrees or disagrees with (1) the vast majority of Weiner's diagnostic opinions as set forth in the

99 MRI reports at issue; or (2) Dr. Coyne's criticisms of Weiner's analyses.  Instead, in his short

7

report, Dr. Pukenas offers general commentary, including that radiologists often disagree with

each other as to what an MRI reveals, and "often disagree with themselves when reading the

same scan at different times." (Id.)

As to Dr. Coyne's reports, Pukenas dismisses them as not reliable, because Coyne

did not consider "the clinical information available to Dr. Weiner at the time he conducted the

initial reads [of the patients' MRIs]." (Id. at 1; see also id. at 3 (noting that Weiner "had access

to clinical data when reviewing the scans"); id. (asserting that "Dr. Weiner's use of clinical data

appears to have resulted in more appropriate diagnoses"); id. (noting that while "Dr. Weiner

use[d] clinical data, Dr. Coyne stated in his report that he did not review or consider clinical

information on the patients"); id. (asserting that "clinical information on a patient's condition is

an important part of interpreting diagnostic images in radiology"); id. at 3-4 (criticizing Coyne's

failure to "consider[] . . . patient [N.B.'s] clinical history); id. at 4 ("Without understanding the

clinical history and circumstances, it would be difficult for a radiologist to evaluate whether an

imaging finding . . . is the etiology of a patient's pain."); id. at 4 (asserting that "Dr. Coyne's

methodology is inappropriate" given his "fail[ure] to consider patient clinical information"))

## V.     PROCEDURAL HISTORY

The Government produced the Initial Coyne Report to Weiner on April 13, 2022,

and produced the Supplemental Coyne Report on November 15, 2022. (Govt. Br. (Dkt. No. 309)

at 2)

Weiner produced the Pukenas Report to the Government on December 22, 2023 –

more than a year after the Supplemental Coyne Report and less than a month before the January

17, 2024 trial date. (Id.)

The Government filed the instant motion on December 24, 2023. (Id.) Weiner

filed his opposition on December 28, 2023. (Dkt. No. 317) That same day, Weiner produced to

the Government certain "clinical data" that Dr. Pukenas considered in preparing his report.

(Govt. Reply (Dkt. No. 320) at 1)  The Government filed a reply on December 29, 2023.  (Id.)

**DISCUSSION**

Federal Rule of Criminal Procedure 16(b)(1)(C)(iii) provides that a defendant's

expert witness disclosure must include, inter alia, "a complete statement of all opinions that the

defendant will elicit from the [expert] witness in the defendant's case-in-chief" and "the bases

and reasons for them."  Fed. R. Crim. P. 16(b)(1)(C)(iii)  The Government contends that

Weiner's expert disclosures do not meet this standard, and asks the Court to order Weiner to

supplement his disclosures by adding an "MRI-by-MRI analysis" for each of the MRI reports Dr.

Pukenas reviewed.  (Govt. Br. (Dkt. No. 309) at 3, 8)

**I.      MOTION TO COMPEL**

**A.      Applicable Law**

As discussed above, Rule 16(b)(1)(C)(iii) of the Federal Rules of Criminal

Procedure requires a defendant intending to offer expert testimony to disclose to the

Government, inter alia, (1) "a complete statement of all opinions that the defendant will elicit

from the witness in the defendant's case-in-chief"; (2) and "the bases and reasons for them."

Fed. R. Crim. P. 16(b)(1)(C)(iii).

The purpose of the expert disclosure requirement is "to minimize surprise that

often results from unexpected expert testimony, reduce the need for continuances, and to provide

the opponent with a fair opportunity to test the merit of the expert's testimony through focused

cross-examination."  Fed. R. Crim. P. 16, advisory committee note to 1993 amendment.

Disclosure of the "bases relied upon by the expert . . . should cover not only written and oral

reports, tests, reports, and investigations, but any information that might be recognized as a

legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." Id.

Courts applying these principles have noted that a "general description of possible bases does not meet the requirements of Rule 16(b)(1)(C)." United States v. Sturman, No. 96 CR. 318 (BSJ), 1998 WL 126066, at *1 (S.D.N.Y. Mar. 20, 1998). Disclosures must include more than a "guess as to various opinions" included in the expert's submission. United States v. Ulbricht, No. 14-CR-68 KBF, 2015 WL 413318, at *6 (S.D.N.Y. Feb. 1, 2015), aff'd, 858 F.3d 71 (2d Cir. 2017).

"[T]he extent of detail required . . . will depend on the nature of the expert testimony." United States v. Wilkerson, 189 F.R.D. 14, 16 (D. Mass. 1999). In particular, "'complex testimony will require more substantial disclosures.'" United States v. Tuzman, No. 15 CR. 536 (PGG), 2017 WL 6527261, at *11 (S.D.N.Y. Dec. 18, 2017) (quoting United States v. Ferguson, 2007 WL 4539646, at *2 (D. Conn. Dec. 14, 2007)). "[C]ases involving technical or scientific evidence, may require greater disclosure, including written and oral reports, tests investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed. R. Evid. 703." United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995) (citing Rule 16, advisory committee note to 1993 amendment). For example, "[w]here a defendant supplies a 'list of tests' that the expert performed or 'other expert reports he had read,' a failure to state what that expert concluded 'from any individual test results . . . or expert report' renders disclosure insufficient." Tuzman, 2017 WL 6527261, at *11 (quoting United States v. Day, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008)).

Where a party has not complied with the disclosure requirements of Rule 16, "the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and

manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). A "district court has 'broad discretion in fashioning a remedy'" for Rule 16 violations, "which may include granting a continuance or 'ordering the exclusion of evidence.'" United States v. Ulbricht, 858 F.3d 71, 115 (2d Cir. 2017) (quoting United States v. Lee, 834 F.3d 145, 158 (2d Cir. 2016)).

### B.      Analysis

The Government contends that Weiner's disclosures do not constitute "'a complete statement of all [the] opinions'" that Weiner will elicit from Dr. Pukenas at trial, and that Weiner has not disclosed all of "'the bases and reasons'" for Dr. Pukenas's opinions. (Govt. Br. (Dkt. No. 309) at 5-6 (quoting Fed. R. Crim. P. 16(b)(1)(C)(iii)) According to the Government, Dr. Pukenas's conclusions are "impossible to verify" because they are not "specifically tied to his opinions as to each MRI report." (Id. at 5) The Government therefore asks this Court to direct that Dr. Pukenas conduct an "MRI-by-MRI analysis" setting forth his conclusions as to each of the Weiner MRI reports that he reviewed. (Id. at 6) Absent such an analysis, the Government claims that it will be "impossible for Dr. Coyne to opine on Dr. Pukenas' conclusions[,] because Dr. Coyne does not know the Pukenas Report's bases and reasons." (Id. at 7)

The Court concludes that Weiner has not adequately disclosed the "bases and reasons" for Dr. Pukenas's conclusions and opinions concerning the individual MRI reports that are at issue. As Weiner himself argued in seeking a bill of particulars, this case cannot be properly litigated absent an understanding of what MRI reports Weiner allegedly falsified and how he falsified these reports. (Weiner MTD Br. (Dkt. No. 107) at 5, 9) For that reason, the Government arranged for Dr. Coyne to address – in his expert reports – the Weiner MRI reports

11

that the Government intends to argue were falsified, including an explanation of how they were falsified.  (See Apr. 28, 2023 Tr. (Dkt. No. 162) at 25-26) (Weiner's counsel acknowledging at oral argument on his motion for a bill of particulars that "that the government has identified through expert reports a number [of MRI reports] that it believes were falsified" and "[w]e can obviously respond to those reports").  As to each MRI image, Dr. Coyne offers a diagnostic opinion, and as to each of Weiner's MRI reports, Coyne explains in detail why the report is accurate or inaccurate.  (Coyne Initial Report & Coyne Supplemental Report (Dkt. No. 309), Exh. A at 17-37, Exh. B at 43-71)

In response, Dr. Pukenas produced a six-page report that provides almost no analysis of any individual MRI image or MRI report.  Dr. Pukenas instead offers conclusions and generalities, including that he sees no "pattern of overreporting or exaggerating findings"; "that radiologists often disagree regarding particular findings when reading MRIs"; "that radiologists often disagree with themselves"; and that clinical information is necessary in order to properly interpret an MRI image.  (Pukenas Report (Dkt. No. 317-1) at 2 & n.2, 3)  These conclusions and generalities are not adequate under Rule 16, however, because they do not permit the reader to understand the "bases and reasons" for why Dr. Pukenas believes that Weiner's MRI reports are legitimate.  To meet Rule 16's requirements, Dr. Pukenas must explain – as to each individual MRI image and MRI report at issue – why he believes that Weiner's MRI report meets the standard of care for radiologists.  As matters currently stand, Dr. Pukenas has not explained in any systematic way which of Weiner's MRI reports he believes are legitimate, which he disagrees with, and what his reasons are for those determinations.

In sum, Weiner's expert disclosures regarding Dr. Pukenas are deficient under Rule 16.  By **12:00 noon on January 11, 2024**, Weiner will supplement his expert disclosures with patient-specific detail for each of the MRI reports reviewed by Dr. Pukenas.

## CONCLUSION

For the reasons stated above, the Government's motion to compel supplemental expert disclosures pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure is granted.[6] By **12:00 noon on January 11, 2024**, Weiner will supplement his expert disclosures with patient-specific detail for each of the MRI reports reviewed by Dr. Pukenas.

Dated:  New York, New York
        January 5, 2024

                                    SO ORDERED.

                                    _____
                                    Paul G. Gardephe
                                    United States District Judge

---

[6] The Government also moved to compel Defendant Weiner to produce certain "clinical data" that Dr. Pukenas relies on in his report.  (Govt. Br. (Dkt. No. 309) at 2)  The Government's motion is denied as moot on this point, because Weiner produced the requested clinical data with his opposition brief.  (See Govt. Reply (Dkt. No. 320) at 1)  To the extent that the Government moves to preclude Dr. Pukenas from offering speculative testimony regarding "Dr. Weiner's methodology for preparing MRI reports" (Govt. Br. (Dkt. No. 309) at 8), that issue will be addressed in the context of the Government's recently filed Daubert motion.  (See Dkt. No. 331)